### PRO–PHY–LAC–TIC BRUSH CO. v. ABRAHAM & STRAUS, Inc.

District Court, E. D. New York.
June 11, 1935.

INCH, District Judge.

Plaintiff seeks an injunction against the use, by defendant, of the word "Prophylactic."

Plaintiff claims that the word "Prophylactic" itself is not well known and when used is descriptively used as an adjective. That a trade-mark in such a word can exist only when it has acquired a secondary meaning. That in the case of plaintiff it has obtained such meaning but not in the case of defendant. That defendant cannot rely on registrations of this trade-mark for tooth powder. That even if the trade-mark is good, the title is defective. That defendant's vendor and defendant have unfairly competed with plaintiff.

On the other hand, defendant asserts that tooth powder and toothbrushes are so dissimilar that they cannot be considered "related" merchandise or competitive articles. That both plaintiff's and defendant's vendor trace their rights to the same source. That plaintiff refused to enter the tooth powder field. That plaintiff has created the confusion as to origin, and that if any such confusion results it is only from the exercise of their legal rights by the respective parties. That plaintiff is guilty of unfair competition. That defendant has not been guilty of imitating plaintiff's trade-mark, so as to palm off its product or confuse the two. That plaintiff is guilty of laches sufficient to bar relief. That there exists an equitable estoppel amounting to a defense, and finally that there can be no monopoly of color.

Almost seventy years ago the Florence Company, a Massachusetts corporation at Florence, that state, went into the business of manufacturing and selling brushes of various sorts. In 1924 the Pro-phy-lac-tic Brush Company, likewise a Massachusetts corporation, was incorporated and succeeded to the business. In 1930 the plaintiff, a Delaware corporation, succeeded, in turn, to this business which is still conducted at Florence, Mass., and is the owner of all the various trade-marks, patent rights, etc., relating to its toothbrush.

About fifty years ago a New York dentist, Dr. Rhein, had duly sold and transferred to the Florence Company a toothbrush, which he subsequently patented, which he called the "Prophylactic" toothbrush. I shall refer hereafter to the plaintiff instead of the preceding corporate steps in title, etc.

Nims & Verdi, of New York City (Harry D. Nims, George P. Dike, Wallace H. Martin, and Stewart L. Whitman, all of New York City, of counsel), for plaintiff.

Davies, Auerbach & Cornell, of New York City (Martin Schenck, Kenneth W. Greenawalt, and George T. Bean, all of New York City, of counsel), for defendant.

For over a half a century, therefore, plaintiff has been engaged in the manufacturing and selling of this particular kind of toothbrush under the name of "Prophylactic." It has attained great popularity.

In 1891 this name "Prophylactic" was duly registered as a trade-mark. It was again registered in 1902. Three years thereafter it was again registered in hyphenated form. This registration was renewed in 1925.

For these fifty years this toothbrush was always contained in a "yellow" carton with the word "Prophylactic" in "red" letters. For about forty years this colored carton has been emphasized.

In 1913 the label and title "Pro-phy-lactic Tooth Brush" was registered showing this yellow box or carton and also in 1925.

■ It is fair to say that, from the evidence in this suit, this particular toothbrush, in its distinctive carton, yellow box with the red letters "Prophylactic," has been for years very widely known throughout the entire United States and elsewhere. The distinctive word "Prophylactic," by this association, has come to mean to consumers and buyers generally, not only plaintiff's toothbrush, but to indicate the source of its manufacture. This trademark has acquired a secondary meaning. G. & C. Merriam Co. v. Saalfield (C. C. A.) 198 F. 369.

During this long period plaintiff has expended large sums of money in advertising. This advertising has been in all the leading periodical magazines and trade journals of the country and in various other ways.

To-day the business is a very large and important one, identified by this unusual distinctive word "Prophylactic" accompanied and accentuated by the "yellow carton" and the word in "red letters."

From 1924 to 1933 the yearly average of sales of this brush, in its yellow box, has been in excess of 7,500,000 brushes. The yearly expenditure for advertising has been approximately $500,000.

Yet this large and profitable business finds itself in a position where it must now appeal to a court of equity to protect it from a recent adroit appropriation of its good will and trade-marks, on which it has spent these large sums of money, because there has been offered an opportunity to this unfair competitor not only to mislead the buying public into believing that the source of manufacture of a tooth powder of such competitor is identical with the source of manufacture of plaintiff's toothbrush, but seriously endangering any fair opportunity for plaintiff to itself manufacture and sell a tooth powder to the millions who now use its toothbrush.

As to possible extension of mark, see Loonen v. Deitsch (C. C.) 189 F. 487–491.

The adroit scheme mentioned arises as follows: Dr. Rhein, the dentist, who as above stated originally sold the rights to the toothbrush, etc., to plaintiff, also had made up for him, and later manufactured himself, a tooth powder under the name "Prophylactic." This business he did not sell. During the years up to his death in 1928, he sold this tooth powder as best he could by himself or in corporate form, with limited advertising mostly in dental journals. These sales were mostly confined to the New York City area. He put up this tooth powder always in a "gray or cream can with a purple top." He had the formula patented, the patent issuing to his wife, as assignee.

In 1908 he registered the word "Prophylactic" for this tooth powder and tooth paste. He founded the corporation Prophylactic Tooth Powder, Inc., with himself and his wife as officers. The mark was subsequently renewed in 1928 by this corporation. During this time Dr. Rhein was very anxious to sell the tooth powder business to plaintiff's predecessor, without success.

In 1922, Dr. Rhein made arrangements with a well-known drug concern in New York to distribute the powder, and both he and his wife did their best, by attending conventions, etc., to aid and assist a wider distribution. The powder was always in the cans decorated as above.

This Tooth Powder Company also registered another mark in the form of a "frustrated triangle."

When he died, Dr. Rhein left in his will instructions for his executors and trustees to carry on this business of the Prophylactic Tooth Powder, Inc. This was done for a while until the Prophylactic Products Corporation was incorporated. Later this Products Corporation to all intents and purposes went out of business, its ten-year license was canceled, and it reassigned to the Prophylactic Tooth Powder, Inc., all its rights and business. The

executors and trustees of Dr. Rhein's will also released and transferred to the Prophylactic Tooth Powder, Inc., all their rights in the trade-mark, patents, and good will. Thereafter this Products Corporation executed a bill of sale, to Park & Tilford, Inc., a Delaware holding company, of certain tooth powder that it had on hand and the Prophylactic Tooth Powder, Inc., executed to this Park & Tilford, Inc., an exclusive license to manufacture and sell "Prophylactic" tooth powder, which carried with it exclusive rights in all the trade-marks, patents, and the good will of the business.

This Park & Tilford, Inc., which is simply a holding corporation, holds and controls the stock of a number of subsidiary companies, among them Prophylactic Products, Inc. (New York 1933), and Park & Tilford, likewise a New York corporation. The former then designated the latter its sales and distributing agent. Apparently back of all this web of corporate interests is the Shulte Cigar Stores interests.

There is no controversy here over the fact that it is Park & Tilford (New York) that is now conducting the defense of this particular defendant. The real controversy exists between plaintiff and these large outside interests.

The defendant is a large department store in Brooklyn (a New York corporation). It sold tooth powder labeled "Pro phy lac tic," which it buys from Park & Tilford, the "distributor."

■ The mere fact, however, that defendant is merely such buyer or agent is no ground for refusing an injunction against it if the facts require the issuance of same. Walter Baker Co. v. Sanders (C. C. A.) 80 F. 889–891; Meccano, Ltd., v. John Wanamaker, New York (D. C.) 241 F. 133; Siegert v. Gandolfi (C. C. A.) 149 F. 100.

Plaintiff asks for no accounting in this suit.

There is a suit pending for the same cause in the Southern District of New York, which has not as yet been reached there for trial. That suit is against the Park & Tilford Corporation. Plaintiff applied for and has obtained from the District Court, in that suit, a temporary injunction.

No temporary injunction has been asked for in this suit.

The proof shows that both plaintiff and Park & Tilford, Inc., trace back their claimed rights in the word "Prophylactic" to a common source, to wit, Dr. Rhein, the dentist.

These rights, thus obtained by plaintiff, as to trade-marks, etc., are clear and free from doubt.

On the other hand, the rights in Park & Tilford, Inc., are open to grave doubt as to their validity. There appears to have been past assignments by Mrs. Rhein as well as by Dr. Rhein, transfers and retransfers, and execution of licenses, all without due regard to any existing business. They have finally come to rest in a "holding" company. The source of manufacture is confusing to say the least. United Drug v. Theodore Rectanus Co., 248 U. S. 90, 39 S. Ct. 48, 63 L. Ed. 141; Hanover Star Milling Co. v. Metcalf (Allen & Wheeler Co. v. Hanover Star Milling Co.), 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713.

■ When the tooth powder is considered, the inconsequential amount of its sales and limited area of such sales fail to provide any adequate basis for a finding that the word "Prophylactic" had been so widely associated in the sale of the tooth powder as to indicate a different source of manufacture from the source of the toothbrushes and establish a secondary meaning in this regard. Macmahan Pharmacal Co. v. Denver Chemical Mfg. Co. (C. C. A.) 113 F. 468, 473.

It is doubtful indeed if defendant can rely on this trade-mark as to tooth powder as an adequate defense in this suit. Shaver v. Heller & Merz Co. (C. C. A.) 108 F. 821, 65 L. R. A. 878.

■ Defendant, however, asserts that toothbrushes and tooth powders are not "related" goods. In this I cannot agree. It is sufficient if they belong to the same general class of merchandise. R. H. Macy & Co. v. H. W. Carter & Sons, 56 App. D. C. 249, 12 F.(2d) 190. They are "so closely associated in the minds of the public that if they should bear the same name a consumer would be justified in concluding that they have the same origin." See Nims on Unfair Competition (3d Ed.) p. 621, citing Oppenheim, etc., v. President, etc., 55 App. D. C. 147, 3 F.(2d) 88, and various cases for and against.

"Goods, though different, may be so related as to fall within the mischief which

equity should prevent." Aunt Jemima Mills Co. v. Rigney & Co. (C. C. A.) 247 F. 407, 409, L. R. A. 1918C, 1039.

Toothbrushes and tooth powder go together. They are sold together. The evidence in this very case alone indicates clearly that this close relation exists between the two. It was particularly relied upon by this competitor so that the name on the toothbrush would be of great benefit to those selling its tooth powder.

It is plainly necessary, in order to avoid further confusion of the public, that a court of equity properly intervene. Otherwise this deception, and the palming off of one's goods as that of another, will most certainly continue. Goodyear's India Rubber Glove Mfg. Co. v. Goodyear Rubber Co., 128 U. S. 598, 9 S. Ct. 166, 32 L. Ed. 535; Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U. S. 118, 25 S. Ct. 609, 49 L. Ed. 972. There will also be the misappropriation by one concern of what equitably belongs to a competitor. International News Service v. Associated Press, 248 U. S. 215, 39 S. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293.

From the facts presented by this record we are not astonished to find sufficiently proven that this deliberate confusion has occurred and been occasioned.

No sooner did Park & Tilford, Inc., obtain the alleged rights of the trade-mark, etc., as to tooth powder, although in the uncertain manner above stated, it abandoned the purple and cream color can of Dr. Rhein and proceeded to carefully copy the color, to wit, the "yellow," with the "red," which had so long identified plaintiff's merchandise. It even imitated the division of the word "Prophylactic" into syllables and made up packages that would mislead, or tend to mislead, any ordinary purchaser as to the source of manufacture of the tooth powder.

This imitation was plainly deliberate and not accidental. Fairbank Co. v. R. W. Bell Mfg. Co. (C. C. A.) 77 F. 869.

With the large resources and channels for distribution belonging to this unfair competitor, it proceeded to deluge the country in over 14,000 drug stores and 2,-500 chain stores, with this imitation.

The fraud is so plain that even this competitor did not dare continue it. On the contrary, it now indicates that it no longer will thus mislead the public. It contends, however, that it still has the right to use the word "Prophylactic" because of the trade-mark.

It did not so discontinue after notice, and in fact not until suit was commenced. Straus v. Notaseme Hosiery Co., 240 U. S. 179, 36 S. Ct. 288, 60 L. Ed. 590; Feil v. American Serum Co. (C. C. A.) 16 F.(2d) 88; A. Bourjois & Co., Inc., v. Katzel, 260 U. S. 689, 43 S. Ct. 244, 67 L. Ed. 464, 26 A. L. R. 567; Howard Dustless Duster Co. v. Carleton (D. C.) 219 F. 913.

■ While color cannot alone be a ground for monopoly, if it is an extrinsic element of deceit its use can be restrained. Coca-Cola Co. v. Koke Co., 254 U. S. 143–147, 41 S. Ct. 113, 65 L. Ed. 189; Turner & Seymour Mfg. Co. v. A. & J. Mfg. Co. (C. C. A.) 20 F.(2d) 298; Lalance & Grosjean Mfg. Co. v. National Enameling & Stamping Co. (C. C.) 109 F. 317; Florence Mfg. Co. v. J. C. Dowd & Co. (C. C. A.) 178 F. 73.

The value of a trade-mark may be lost. Falk v. American West Indies Trading Co., 180 N. Y. 445, 73 N. E. 239, 1 L. R. A. (N. S.) 704, 105 Am. St. Rep. 778, 2 Ann. Cas. 216; Eiseman v. Schiffer (C. C.) 157 F. 473.

In other words, it would appear that this competitor, having flooded the country with what is now apparently conceded to have been a misleading can and label, nevertheless asks this court of equity to still preserve its rights in the mark "Prophylactic."

Equity should turn a deaf ear to such a belated plea under such circumstances.

The repentant one seeks "in equity" to retain the tool with which it committed the wrong.

The fraud is found in the unfair "use" of the trade-mark with its distinctive colors. I see no reasonable way of dissecting it and separating the good from the bad.

It was not the desire of the plaintiff to enter the tooth powder field, proper though this may be, that prompted this litigation, but the deception of those already in the field to mislead the public and unfairly compete with plaintiff in "related" merchandise.

■ Nor has there been any delay in bringing suit against this defendant. Delay alone, on the facts here, would not be sufficient to bar a decree. McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828; Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 21 S. Ct. 7, 45 L. Ed. 60.

I find no ground on which to base an equitable estoppel on the facts here.

[7] The tooth powder manufactured and sold·by Dr. Rhein and those who succeeded him presented no such fraud on the public. It may well be, in view of the record, that a court of equity would have endeavored to temper its decree in accordance with that competition between two honest and friendly competitors. But where this has ceased and now it appears that a plain fraud by others has supervened, such equitable rights, if any, cannot be here considered.

Nor can I find assurance, in view of what has plainly taken place, that a repetition of this fraud, or in some other ingenious way, may not take place, occasioning other suits and possibly further damage to plaintiff's business and good will.

Accordingly, regardless of technical trade-mark and other legal rights that might arise on a different state of facts, it seems to me plain that this competitor and defendant cannot be heard to complain if, by its fraud, it has forfeited the protection of such technical rights in the name "Prophylactic" in a court of equity, which it might otherwise have had, had it proceeded with fair dealing.

"A court of equity will extend no aid to sustain a claim to a trade-mark of an article which is put forth with a misrepresentation to the public as to the manufacturer of the article, and as to the place where it is manufactured." * * * Manhattan Medicine Co. v. Wood, 108 U. S. 218–222, 2 S. Ct. 436, 438, 27 L. Ed. 706.

■ "A court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses, and whatever use he may make of them in a court of law, he will be held remediless in a court of equity." Deweese v. Reinhard, 165 U. S. 386–390, 17 S. Ct. 340, 341, 41 L. Ed. 757.

The mere fact that this particular defendant finds itself a defendant in this sort of suit may be unfortunate, but it chose to aid and assist the deception and unfair competitor, and plaintiff is entitled to a decree against it in accordance with this decision.

Decree for plaintiff, with costs. Submit findings. Settle decree on notice.